# Exhibit O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
SABINE KRAUT,

                                                            CASE NO.

                            Plaintiff,

                                                            **JURY TRIAL DEMANDED**

              -against-

WAFRA INC.,                                                 **COMPLAINT**
FRANCIS P. LIVELY

                            Defendants.
------------------------------------------------------------ X

Plaintiff Sabine Kraut ("Kraut"), by her undersigned counsel, for her Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this lawsuit in response to ongoing and pervasive acts of sexual harassment, sexual discrimination, and retaliation by Defendant Wafra Inc. (formally WAFRA Investment Advisory Group, Inc.) ("Wafra"), its employees and agents and Defendant Francis ("Frank") P. Lively ("Mr. Lively") (together, the "Defendants").

2.      This is a case about a woman who endured six years of persistent sexual harassment at the hands of the man who had direct control over her career, career growth, and day-to-day tasks, and who exploited his superior position to inundate her with a barrage of unsolicited and unwanted advances during her past six years at Wafra.  Not only did Mr. Lively sexually harass her, he deprived her of at least 1 percent origination credit for a profitable real estate investment fund that she brought to Wafra and deprived her of promotion opportunities.  This conduct occurred in an environment where Wafra's Human Resources Department did not provide a formal process for recourse.  For most of the relevant period, and until recently, Wafra's handbook

1

directed victims of sexual harassment to report to his or her direct supervisor, Wafra's Controller, or Wafra's Chief Financial Officer, thus exemplifying the fact that the Human Resources Department effectively had no internal, confidential, or objective process that provided a safe place to report sexual harassment separate and apart from Wafra personnel who were directly involved in her employment responsibilities.

3.      As described in greater particularity below, Plaintiff is an employee of Wafra and was employed full-time when subjected to: sexual harassment by her direct superior for at least six years; sexual discrimination and deprivation of promotions and advancement opportunities due to her gender and because she resisted and rejected physical advances by her direct superior; and retaliation by Defendant Wafra and its employees and agents after Plaintiff reported the conduct of her superior.

4.      This conduct has caused Plaintiff serious economic harm and emotional pain and suffering.

5.      Accordingly, Plaintiff brings this civil rights action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and Title 1 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, for unlawful sexual harassment in the workplace by Defendant Mr. Lively, retaliation and bullying by Defendant Wafra after Plaintiff reported such practices, and to provide appropriate relief to employees who were adversely affect by such practices.  Plaintiff also brings this action for sexual harassment, sex discrimination, and retaliation pursuant to the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and New York common law.

6.      In June 2018, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), seeking a right to sue for violations of Title VII.  On September 7, 2018, the EEOC granted Plaintiff with the right to sue against Defendants under federal law.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 42 U.S.C. § 2000e-5(f) (3).

8.      This action is authorized and instituted pursuant to § 706(f) (1), § 706(f) (3), 42 U.S.C. §2000e-5(f) (1), §2000e-5(f) (3).

9.      Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful acts alleged below were, and are now being committed, within the jurisdiction of the United States District Court for the Southern District of New York.

<u>**THE PARTIES**</u>

10.      Plaintiff, Sabine Kraut, is a female residing in New York.  In 1999, Ms. Kraut received her Bachelor's Degree from Cornell University, School of Hotel Administration.  In 2005, Ms. Kraut received her Master's in Real Estate Finance and Investments from New York University.  At all times relevant to this action, Ms. Kraut was a full-time employee working at Wafra in the company's Real Estate Asset Management and Real Estate Acquisition groups under Mr. Lively's supervision.   Ms. Kraut performed her work in a diligent, conscientious, and professional manner.

11.      Defendant Wafra is a global advisory and investment firm, directly owned by the Social Security Trust Fund of Kuwait and doing business continuously in New York.  At all relevant times, Ms. Kraut worked in Wafra's New York office.  Wafra is beneficially owned by the Public Institution for Social Security of Kuwait, a Kuwaiti governmental entity.

12.     At all relevant times, Wafra has been continuously doing business in the State of New York in the Southern District of New York.

13.     At all relevant times, Wafra has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g) and (h).

14.     Defendant Mr. Lively was a full-time employee of Wafra, the head of the Real Estate Direct Investment Group, and Executive Senior Vice President of the Real Estate Division at all relevant times and until April 2018.  At all relevant times, Mr. Lively was her department head and one of Ms. Kraut's direct supervisors.

## FACTUAL ALLEGATIONS

### A.     Sabine Kraut's Background

15.     In or about 2004, Sabine Kraut began her employment at Wafra in a part-time unpaid internship while finishing graduate school.  In 2005, Ms. Kraut received her Master's in Real Estate Finance and Investments from New York University.  After graduation, she began her full-time employment at Wafra.  Initially, Edward Ryan ("Mr. Ryan"), now Managing Director within Wafra's Real Estate Division, was her direct supervisor, but Ms. Kraut has reported to Mr. Lively for hospitality projects since 2004.

16.     In or about 2012, Ms. Kraut was transferred from Wafra's Acquisitions Group to the Asset Management Group.  Her superiors told her she was transferred to work on international deals, utilize her international investment skills, and to be better available to work on marketing projects with Mr. Lively.

17.     When Ms. Kraut transferred into Asset Management, she reported to Mr. Lively for two international office portfolios, marketing, and hospitality assignments, as well as commercial

real estate projects.  Mr. Lively was her direct supervisor for these endeavors.  As such, Mr. Lively

had direct control over Ms. Kraut's staffing and assignments, was responsible for evaluating Ms.

Kraut and writing her performance reviews, and made promotion decisions involving Ms. Kraut.

**B.     Beginning in 2012, Mr. Lively Subjected Ms. Kraut to Pervasive, Continuous, and Egregious Sexual Harassment in the Workplace.**

18.     Beginning in or about 2012, almost immediately after Ms. Kraut began working for

Mr. Lively in Asset Management, Mr. Lively began to subject Ms. Kraut to ongoing sexual

harassment that was pervasive, continuous, and egregious.  Mr. Lively's conduct continued for six

years until he left Wafra, effective April 30, 2018.

19.     In or about March 2012, Mr. Lively and Ms. Kraut took a business trip to Europe.

Mr. Lively used a travel agent who abided by his directives for travel preferences when traveling

with Ms. Kraut, which specifically included directives to book his and Ms. Kraut's airplane seats

next to each other on flights, as well as hotel rooms next to each other.  During this trip, while in

Cannes, France to attend a real estate conference, Ms. Kraut's hotel room was again arranged next

to Mr. Lively's.  Ms. Kraut was uncomfortable that her room was next to Mr. Lively's room.

While at the conference events, Mr. Lively made a comment that he could hear Ms. Kraut

showering early in the morning from his room.

20.     While planning the trip, Mr. Lively had told Ms. Kraut he was extending their trip

to Monaco.  He gave the false pretense of a potential business meeting there.  In Monaco, he again

arranged for his room to be next to Ms. Kraut's.  During the trip, Mr. Lively made physical

advances, which Ms. Kraut rebuffed.

21.     Later, Mr. Lively made an advance on Ms. Kraut that she did not have an

opportunity to rebuff.  After dinner, Mr. Lively abruptly and forcibly kissed Ms. Kraut on the

mouth in front of her hotel room door.  He was with her because he had arranged for his room to

5

be next to hers.  Ms. Kraut jumped away and quickly went back to her room and closed the door. Mr. Lively called to apologize for his conduct and admitted that he should not have kissed Ms. Kraut.  Ms. Kraut responded by telling Mr. Lively that the advance was unwelcome and that she did not know what came over him.  Mr. Lively then confessed his feelings for and attraction to Ms. Kraut, to which Ms. Kraut replied that there was a "disconnect" between them and that she was not interested in him.  Ms. Kraut was scared, but tried to remain calm and did not escalate the conduct because she was fearful of how Mr. Lively would react.

22.     Subsequent to this incident, and continuing for the entire period between 2012 and the end of Mr. Lively's tenure at Wafra, whenever Ms. Kraut was around Mr. Lively -- whether it was in the office or on business trips -- Ms. Kraut felt uncomfortable in Mr. Lively's presence because she constantly noticed him leering at her, which to her felt like he was undressing her with his eyes.

23.     On or about March 9, 2012, despite the fact that Ms. Kraut had recently rebuffed Mr. Lively's sexual advances, Mr. Lively, using Ms. Kraut's native language, called her "Schatzie" (German, for "darling") -- an unwelcome attempt to force an intimate relationship.

24.     Within months of working for Mr. Lively in 2012, Mr. Lively had started to give Ms. Kraut a series of handwritten love letters and notes on his own private personalized stationary and sent her flowers to her residence.

25.     In or about 2012, after a business trip, Mr. Lively gave Ms. Kraut a note containing a love poem and wrote in "For me, the days I spent with you. Love."  When Mr. Lively handed Ms. Kraut the note, he commented in sum and substance that Ms. Kraut was a great catch.  Ms. Kraut had never discussed her personal life with Mr. Lively and the comment was unsolicited.

26.     Also in or about 2012, Mr. Lively gave Ms. Kraut a note that quoted a romantic literary passage.  On the note, Mr. Lively handwrote "My last text to you says it all, nothing more. I wish my feelings were different, I will and am working hard to keep away.  We now know the solution.  If you want to have dinner, a walk or a call, you know I am there for you."

27.     Additionally, as part of their investments and business development, Ms. Kraut went on numerous business trips with Mr. Lively, during which Mr. Lively's behavior became egregious, subjecting Ms. Kraut to uncomfortable, coercive, and demeaning situations as a result of his sexual harassment.  For example, in one instance during a business trip to London, Mr. Lively extended the trip so that they would have to stay through the weekend.  Mr. Lively denied Ms. Kraut the ability to fly home to see her mother in Germany despite the short flight.  On this same trip, Mr. Lively reached out to Ms. Kraut via telephone to make plans, but Ms. Kraut's cellular telephone had run out of battery.  When Ms. Kraut returned to the hotel, she learned that Mr. Lively had directed the hotel to open and enter her hotel room in her absence because she had not responded to his messages.

28.     In or about April 2012, Ms. Kraut and Mr. Lively were on a business trip to Kuwait, Abu Dhabi, and Dubai.  Ms. Kraut made requests to the travel agency for travel arrangements but, unbeknownst to Ms. Kraut, as mentioned above, Mr. Lively had instructed the travel agency to ensure that Ms. Kraut was always seated next to him on flights and that their hotel rooms were next to each other.  Prior to this trip or another trip, Ms. Kraut called the JW Marriott Hotel in Kuwait City in advance of her departure to request a room far away from Mr. Lively, and was ultimately placed on a different floor, because she feared what would happen if her room was next to Mr. Lively's room.  The hotel acknowledged that they understood her fear, and gave Ms. Kraut a room on a different floor, which required a special key card to gain access that Mr. Lively did

not have.  Ms. Kraut asked the hotel staff not to record her request in their internal computer database, because she was scared that Mr. Lively would find out about her request and become angry.

29.     While in Dubai, Mr. Lively made nonconsensual physical advances at Ms. Kraut that crossed the line into sexual assault.  After a business dinner, while they were walking on hotel grounds returning from the hotel restaurant, Mr. Lively unexpectedly and suddenly put his hand up Ms. Kraut's dress and reached for her private area in an attempt to grope her.  Ms. Kraut jumped away, but Mr. Lively still managed to touch her thigh.  Ms. Kraut was frightened, disgusted, and in fear of her physical safety.  She shouted at Mr. Lively in outrage, and asked him why he would do such a thing.  Mr. Lively responded that he had been looking at Ms. Kraut's buttocks during the night and did not see panty lines, and that he was aroused by the notion in his mind that she may not be wearing underwear (although in reality, she was).  Ms. Kraut quickly walked to her room.  Ms. Kraut did not invite any advances from Mr. Lively.

30.     Despite Ms. Kraut being clear to Mr. Lively with obvious anger about and revulsion to his trying to grab her private parts, Mr. Lively was not chastened:  Thereafter, when Ms. Kraut would come to the office wearing the same dress she wore that night, Mr. Lively would comment "Oh, I remember '*that*' dress."

31.     This was not the only time Mr. Lively told Ms. Kraut that he fantasized about her without underwear.  During the trip in Dubai (prior to the groping incident), Ms. Kraut bought a pair of loose pants, and Mr. Lively later saw her wearing them.  Sometime after the trip, Mr. Lively commented that he remembered thinking that when she wore those pants, he thought she was not wearing any underwear.  In general, he frequently, made comments about her appearance and what she was wearing, including, for example, that Ms. Kraut "would look good in a burlap sack."

32.     Shortly after the groping incident in Dubai, Mr. Lively informed Ms. Kraut that he had spoken with one of the company's lawyers, Mr. John Opar of Shearman & Sterling, regarding his conduct. He expressed to Ms. Kraut that he was sorry for how he behaved again, that he realized that he couldn't take his actions back, and that he knew the damage was already done.

33.     During this time period in or about 2012 and thereafter until Mr. Lively left Wafra, Mr. Lively would regularly email Ms. Kraut reminding her that he had sent her "messages" to her personal Blackberry.  This was a common and consistent method Mr. Lively employed to harass and assert control over Ms. Kraut:  Mr. Lively sent Ms. Kraut inappropriate, imposing, and intimate messages on Ms. Kraut's *personal* Blackberry from his business device.  Mr. Lively indicated to Ms. Kraut that he did not believe Wafra was monitoring his business emails and text messages. Therefore, Mr. Lively sent Ms. Kraut messages on her personal device for two reasons.  First, so that Wafra could not monitor either end of the conversation, and second, because he used a messaging application that allowed him to monitor, through the device's notification feature, when Ms. Kraut read his messages.  If Ms. Kraut did not read or respond to the message in a timely manner, Mr. Lively would harass Ms. Kraut on her work email and direct her to check her messages or Blackberry Messages ("BBMs").  Often, Mr. Lively's BBMs confessed his feelings for Ms. Kraut explicitly.  Ms. Kraut usually attempted to deflect Mr. Lively's inappropriate and personal messages by reverting her response back to strictly work matters.  Mr. Lively continuously harassed Ms. Kraut by sending BBMs to her Blackberry and later text messages to her personal cellular telephone from 2012 until he left Wafra in April 2018.

34.     In or about the spring and summer of 2012, Ms. Kraut and Mr. Lively went on numerous business trips to Europe.  During one such trip, Mr. Lively again confessed his love for Ms. Kraut and sent her additional love letters.  Mr. Lively frequently mentioned that he was trying

to support Ms. Kraut's career and that his pointed interest in her was really to encourage her to create more business for their group.  Mr. Lively's comments insinuated that he had complete control over her career and promotion trajectory at Wafra as her direct supervisor, and, therefore, Ms. Kraut was unable to complain or report Mr. Lively's unlawful conduct.  If she complained, she was scared that she would be terminated or demoted.  In addition, Wafra's Human Resource Department did not have a formal process to report such conduct.

35.     In or about the summer 2012 and other times thereafter through 2016, Mr. Lively, who is married, called Ms. Kraut into his office, closed the door so she could not leave and said "what are the chances that we can be together."  Each time, Ms. Kraut clearly stated that she would never ever be with Mr. Lively romantically.  When this occurred, Mr. Lively would become visibly upset and would not speak to her for days thereafter.  Ms. Kraut felt trapped in the enclosed office, and was always fearful that Mr. Lively might impose on her if he asked to see her in his office.  Ms. Kraut remained as polite as could have been expected from a professional employee, because he was her supervisor, and she never encouraged Mr. Lively.

36.     In or about June 2012, Ms. Kraut and Mr. Lively were on a business trip in Paris, France.  While in Paris, Mr. Lively emailed Ms. Kraut that he had bought her something and wanted to drop it off in her room.  She did not respond to his request.  Later, in the hotel elevator, Mr. Lively pushed an antique and vintage necklace into her hands.  Ms. Kraut told Mr. Lively that she did not want the gift, but Mr. Lively was forceful about her keeping it.  Because Mr. Lively had a habit of not speaking to Ms. Kraut for days after she rejected him, and because they were on a business trip together, she eventually relented and politely accepted the gift, while still making clear that she was not accepting any sort of romantic gesture.  Mr. Lively enclosed a note with the pearl necklace that stated "A little gift for you, as I could not leave you out if I gave to our French

friends.  I enjoy giving to you, big and little things, as it makes me happy to see you smile and be

happy.  I know I am a prideful man, and that can get a man in trouble, but it is my desire to please

you and see you happy […] is a choice I make freely.  I will be at your service and available to

you always.  Enjoy the best chocolate in the world…if not Hersey, Pennsylvania."  In the years

since Mr. Lively gave Ms. Kraut the pearl necklace, he would ask Ms. Kraut from time to time

why she was not wearing the necklace to work.

37.     In or about late July 2012, Ms. Kraut continued to make it clear that she did not

reciprocate Mr. Lively's romantic feelings.  Mr. Lively became very upset and said that he would

leave the company because of his feelings for Ms. Kraut.  However, Mr. Lively did not leave the

company.  Instead, he persisted in his harassment of Ms. Kraut.  On the occasion of July 4, 2012,

Mr. Lively came to Ms. Kraut's apartment building and left a handwritten note on his personalized

stationary with the concierge that stated "I think you are as hot as a firecracker."  Inside the

envelope, Mr. Lively included a physical firecracker.

38.     On or about August 11, 2012, Mr. Lively mailed Ms. Kraut a handwritten letter

with dried flowers while he was on a personal vacation in Glacier National Park.

39.     Also on or about August 11, 2012, Mr. Lively emailed Ms. Kraut about an

investment fund.  Mr. Lively sent follow-up emails when Ms. Kraut did not immediately respond,

but when she did via official Wafra email, Mr. Lively responded and addressed Ms. Kraut with

"Rupert, I mean Sabine."  Rupert was the name of Mr. Lively's former dog.  Mr. Lively often told

Ms. Kraut that Rupert misbehaved, and by calling Ms. Kraut "Rupert" Mr. Lively was effectively

calling Ms. Kraut a misbehaving dog.  In this instance, Mr. Lively's calling Ms. Kraut "Rupert"

communicated that she he felt she had "misbehaved" by moving the email conversation from her

personal account to her work account, and by not responding quickly enough for his liking.  Mr.

Lively's lashing out further communicated the implication that he would control her (Mr. Lively frequently told Ms. Kraut that Rupert needed an electronic collar to keep him from misbehaving). Indeed, Mr. Lively continuously tried to control Ms. Kraut and use his role as the head of the department and as her direct supervisor to exert his authority. Ms. Kraut felt demeaned, belittled, and objectified.

40.     On or about August 12, 2012, Mr. Lively sent Ms. Kraut an email reminding her to read her personal BBMs and stating that "there were too many open issues from the discussion." He further wrote in a later correspondence, "I said a lot of things yesterday, some of which were unnecessary. See blackberry." Mr. Lively was referring to a discussion in which he told Ms. Kraut that he wants to spend more time with her outside of work.

41.     In or about December 2012, Mr. Lively sent Ms. Kraut a Christmas card with a love letter.

**C.     Mr. Lively continued the ongoing sexual harassment, discrimination, and use of his position to exert control over Ms. Kraut's career consistently between 2012 to April 2018, depriving her of significant income.**

42.     On July 15, 2013, Ms. Kraut emailed Mr. Lively about a work-related matter and Mr. Lively responded stating "I just came back to the office to slap you, you nudge!"

43.     Beyond the constant disparaging and demeaning attacks such as this one, Mr. Lively's harassment went further by intentionally usurping credit for business development, thus depriving Ms. Kraut of significant income.

44.     For example, Ms. Kraut pursued a business opportunity with an industry colleague, Cord Ernst, which was to create a new fund and follow-up funds at Wafra. Ms. Kraut was successful in persuading Mr. Ernst to come to Wafra and build multi-hundred-million-dollar funds. This process of bringing Mr. Ernst into Wafra lasted from approximately the fall of 2012 to approximately the spring of 2014 -- more than a year and a half -- during which time Ms. Kraut

worked diligently on the deal.  But as described below, Ms. Kraut was not properly compensated for these efforts.

45.     Ms. Kraut pursued this deal with Mr. Ernst as a result of Wafra's former CEO's mandate tasking each department head with raising money from non-Gulf based investors.  The first phase of this fund has raised $300 million in equity, and, upon information and belief, it is customary in Wafra and the industry for the individual responsible for securing origination of the deal to receive at least 1% in fees.  Ms. Kraut's instinct for bringing in Mr. Ernst to Wafra was completely accurate as, in addition to the initial German Fund, there is now a follow-on fund aiming to raise another $500 million and there will likely be more funds.  Under industry standards, as well as at Wafra, upon information and belief, Ms. Kraut should receive at least 1% in origination fees for that sum of money as she is responsible for securing these deals for Wafra. Moreover, for any additional funds that Mr. Ernst is responsible for raising during his tenure at Wafra, upon information and belief, Ms. Kraut should receive at least 1% in origination fees.

46.     That Ms. Kraut introduced Mr. Ernst to Wafra is clear from contemporaneous correspondence.  That correspondence also makes clear that Mr. Lively and Wafra knew that Ms. Kraut had introduced Mr. Ernst to Wafra, and that Ms. Kraut had performed significant work to create the new fund.  Company emails from in or about September and October 2012 reflect Ms. Kraut making this introduction and setting up meetings between Mr. Ernst's team and Wafra. These emails also make clear that Mr. Lively had no business relationship or contact with Mr. Ernst and that Ms. Kraut was the only individual responsible for bringing Mr. Ernst to Wafra.  In or about April 2014, Mr. Ernst sent an email to Ms. Kraut, copying Mr. Lively, with the subject line: "Thank you."  In the email, Mr. Ernst wrote to Ms. Kraut, "I want to also thank you for introducing me to Wafra [emoticon of a smiling face omitted] and more importantly being very

supporting to this whole venture!"  Accordingly, Ms. Kraut is entitled to compensation relating to this work.

47.     However, to date, Ms. Kraut has received no origination fees, credit, or compensation for bringing Mr. Ernst to Wafra.  Instead, Mr. Lively improperly deprived Ms. Kraut of credit for bringing the German Fund to Wafra, which has been a major financial success.  Mr. Lively did not give Ms. Kraut any origination credit or fee, depriving her of significant financial equity that is otherwise typical of the market and fund compensation structure.

48.     On numerous occasions in or about 2013 and until Mr. Lively's departure, Ms. Kraut asked Mr. Lively about how she would be credited for originating the German Fund.  In further discussion with Mr. Lively, Ms. Kraut raised wanting to be adequately compensated for funds she would raise in the future.  With respect to receiving credit for future investment development work, Mr. Lively would respond in sum and substance "you have trust issues.  I'll take care of you.  You have to trust me and take what I give you."

49.     In a subsequent performance review, Mr. Lively added as way of explanation that if Ms. Kraut wanted to be compensated based on originations in general, she would have to accept a large cut in her base pay.  Ms. Kraut did not know how to respond as Mr. Lively was in direct control of her promotions.  When Ms. Kraut asked follow-up questions about the compensation structure, Mr. Lively would say that Ms. Kraut was asking too many questions, to trust him, and told Ms. Kraut to "remember how much I am helping you."

50.     In or about November 2013, Ms. Kraut went on a business trip to Amsterdam, Netherlands to attend an annual meeting for a Dutch property fund.  While in Amsterdam, Mr. Lively sent Ms. Kraut a BBM stating that he wanted to kiss her.

51.     Ms. Kraut continued to make clear to Mr. Lively through her verbal responses and actions that she was not interested in any romantic relationship with Mr. Lively whatsoever, that she did not return his romantic feelings, and that his advances were not welcome.  Mr. Lively would continuously become upset.  When traveling, Mr. Lively often threatened to send Ms. Kraut home on the next flight while on business trips as a result of her not responding to his romantic advances.

52.     Also in or about 2014, Mr. Lively severely restricted Ms. Kraut's flexibility during business trips.  As before, Mr. Lively continued to control Ms. Kraut's travel itinerary and directed that they sit next to each other on flights, especially on red-eye flights to Europe and the Gulf region.  Additionally, Ms. Kraut's elderly and ailing mother, who was suffering the effects of a stroke that handicapped her and who is now battling cancer, lives in a small town in Germany near Stuttgart, which was very close to many of Ms. Kraut's and Mr. Lively's destinations on their business trips.  Ms. Kraut requested to visit her mother during her free time before or after work and Mr. Lively denied those requests, while other colleagues were free to make personal plans on weekends and around business meetings.  Mr. Lively simply did not want to be separated from Ms. Kraut; he occasionally proposed an alternative that he accompany Ms. Kraut when she visited her mother.

53.     In or about 2014, while on a business trip and at a breakfast in Paris, France, Ms. Kraut commented on how beautifully the food was presented and prepared at a breakfast buffet prior to a business meeting.  Mr. Lively responded that "the only thing he could think of having on that table was [Ms. Kraut]."

54.     In or about January 2015, Mr. Lively asked Ms. Kraut again if there was really no chance that Ms. Kraut could imagine being romantically involved with him.  Ms. Kraut responded

that she had never been interested in Mr. Lively in a romantic way and would not be interested in the future. Mr. Lively said that he had been waiting for Ms. Kraut for years. Ms. Kraut felt objectified that Mr. Lively's support of her career and work was directly related to his desire to be with her romantically and not because of her professional value. Ms. Kraut felt harassed and coerced to engage in conversations that she deemed inappropriate. Ms. Kraut felt uncomfortable that Mr. Lively continually put her in a position where she had to respond to his advances given that he was her direct supervisor and head of the department, and felt that she did not have a choice but to engage in a conversation if Mr. Lively wanted.

55.     Comments such as these reflected that Mr. Lively was retaliating and discriminating against her -- for example, by denying her credit for deals she had made, denying her promotions or transfers, and reducing her compensation -- because she had rebuffed his romantic advances.

56.     In or about 2015 through 2018, Mr. Lively passed Ms. Kraut over for a promotion, despite numerous past conversations about Ms. Kraut's career trajectory and advancement under his team. As her department head, Mr. Lively had unilateral control over promotion decisions. Ms. Kraut had not been informed or made aware of any performance standards or metrics used to assess qualifications or determine promotions. Although Mr. Lively had praised Ms. Kraut for her exemplary work and repeatedly indicated that he would ensure that she be given the opportunities to grow into more senior roles at Wafra, Mr. Lively promoted a more junior male colleague who had approximately one year of experience at the firm compared to Ms. Kraut's almost eight years of experience. Ms. Kraut was denied a promotion. Mr. Lively was also retaliating and discriminating against her because she rebuffed his romantic advances.

57.     In addition, from in or about 2012 through the end of Mr. Lively's tenure at Wafra, Ms. Kraut was constantly in fear for her physical well-being and safety.  Since she started working for Mr. Lively, he would repeatedly mention that he had "friends in high and low places" and that he would not hesitate threatening others if his professional position or security was compromised. For instance, on one occasion, Mr. Lively indicated his abilities to Ms. Kraut related to the CEO of Wafra, Mr. Fawaz Al-Mubaraki.  Mr. Lively told Ms. Kraut that if Mr. Al-Mubaraki ever threatened his career, Mr. Lively would have a private investigator follow Mr. Al-Mubaraki around, take pictures of him, and potentially others, in compromising situations and threaten to send them to Kuwait where it could do the most damage to Mr. Al-Mubaraki and his career.

58.     Mr. Lively believed he could blackmail Mr. Al-Mubaraki, because he asserted that Mr. Al-Mubaraki was homosexual, and he believed that the Kuwaiti investment team would not support Mr. Al-Mubaraki if they knew he was homosexual.  Mr. Lively also often referred to Mr. Al-Mubaraki as "shit for brains" ("SFB") to Ms. Kraut and other senior team members or in company emails.  For example, on or about May 26, 2017, Mr. Lively sent Ms. Kraut an email referring to Mr. Al-Mubaraki as "SFB."  This was a constant occurrence from Mr. Lively in email correspondence.  Because Ms. Kraut was aware of how Mr. Lively was capable of threatening other colleagues for jeopardizing his role at Wafra, she was constantly fearful that Mr. Lively would continue to retaliate against her.  Therefore, this was another reason that Ms. Kraut was fearful to report his conduct.

59.     Later in or about 2017, during a business trip to the Gulf Region, Mr. Lively gave Ms. Kraut yet another lavish gift that she did not want -- a Cartier bracelet -- and reaffirmed his intentions and affection for her, stating that Ms. Kraut was the only reason he came to the office.

Ms. Kraut did not want the gift, but out of fear of upsetting Mr. Lively and being abroad, she politely accepted it despite her reluctance.

60.     Mr. Lively continued this unwanted romantic offensive later on the trip, by asking Ms. Kraut to sit with him at seaside.  Ms. Kraut went and wore a tee shirt and loose long pants. When Mr. Lively saw her, he appeared upset and said, in sum and substance, "I only came so I could see you in a bikini."  Mr. Lively was wearing nothing but his underwear (boxer shorts).

61.     On or about October 26, 2017, Mr. Lively insisted on driving Ms. Kraut to her home after work.  While in the enclosed vehicle, Mr. Lively began making sexual comments towards Ms. Kraut, making her uncomfortable.  Mr. Lively became aggressive with his verbal advances and Ms. Kraut did not know what Mr. Lively was capable of doing.  In attempts to document the ongoing sexual harassment, Ms. Kraut turned on the recording function of her cellular telephone. During the audio recording, Mr. Lively confessed his ongoing love for Ms. Kraut for six years, and acknowledged that his conduct was unsolicited, that Ms. Kraut's work was good, and that his feelings impacted Ms. Kraut's ability to perform her work duties.

62.     In or about February 2018, Mr. Lively did not promote Ms. Kraut from Vice President to Director while three men in the real estate group were promoted.  When Ms. Kraut asked Mr. Lively why she was not promoted, Mr. Lively said that the men needed a higher title to earn respect in the real estate fundraising and marketing industry, but could not give a performance related reason to promote them.  Ms. Kraut said that she also needed the same respect in the industry in her fundraising and marketing role, and that her situation was no different than her male colleagues.  Mr. Lively responded by stating that if he promoted Ms. Kraut then he would have to promote two other women, and he did not want to promote two other women to keep the group's gender balance.

63.     In or about March 2018, while on a business trip to Washington D.C., Mr. Lively and Ms. Kraut were at dinner after business meetings and Mr. Lively admitted again that he was still in love with Ms. Kraut, and that if it were not for her, he would not have a reason to come to the office.

64.     On or about March 31, 2018, the Saturday before Easter Sunday, Mr. Lively came to Ms. Kraut's place of residence without being invited to give her an Easter present.  Mr. Lively's presence is captured on security video from Ms. Kraut's apartment building.  Mr. Lively called Ms. Kraut when he was on his way to her residence and asked her where she was.  Ms. Kraut informed Mr. Lively that she was on her way out to an appointment and would not be at home. Mr. Lively announced he would stop by her residence anyway.  Thereafter, Ms. Kraut's fear for her physical safety increased and after April 1, 2018, she began exiting her residence through the service entrance because she was fearful that Mr. Lively or a private investigator hired by Mr. Lively would be waiting for her outside the main entrance, as he threatened to do with Mr. Al-Mubaraki.

65.     On or about April 12, 2018, after being informed about a call with a potential Kuwaiti investor, Mr. Lively sent a degrading email directly to Ms. Kraut and stated "you need to reevaluate where you think you are and where you really are.  Save the BS email below for someone else."  Mr. Lively was criticizing Ms. Kraut for not inviting Mr. Lively to participate on the call (even though she actually had informed him about the call in advance).  Edward Ryan, Wafra's male head of Acquisitions, was also on the call, but Mr. Lively did not lash out at him. That same day, Mr. Lively came into Ms. Kraut's office and stood behind her while she sat at her desk.  He placed his hands on her the shoulders.  Ms. Kraut pulled away.  Later that day, he told Ms. Kraut he would drop her off at home, but Ms. Kraut declined the ride home.

**D.    During the relevant time period, Wafra had an ineffective Human Resources Department that neither provided adequate reporting channels nor opportunities for remedial or corrective action.**

66.    In or about the beginning of 2012, Wafra's Human Resources Department was still non-existent as it consisted of a single person, an office manager who was a former Pan-Am flight attendant, and who had no substantive experience in Human Resources. There was no effective Human Resources department that could apply preventive or corrective measures to Mr. Lively's sexual harassment and discrimination.

67.    The 2011 Wafra Handbook, which established the company's sexual harassment policies that were in place when Mr. Lively began sexually harassing Ms. Kraut, did not delineate any formal internal Human Resources processes for investigation, recourse, and remedy. Instead, it directed individuals to "immediately report the matter (orally or in writing) to your supervisor, the Controller or the CFO." As Mr. Lively was her supervisor, Ms. Kraut was left without a real guarantee that the designated individuals, who she did not know or trust to keep the matter confidential, could afford her protection through a formal process.

68.    Regardless of Wafra's inept Human Resources Department, Ms. Kraut did not believe reporting Mr. Lively's conduct was an option because she feared more severe retaliation at work and even worse, for her physical safety and well-being. As described above in relation to his comments regarding Mr. Al-Mubaraki, Mr. Lively had on numerous occasions made clear to Ms. Kraut that he was willing to take extreme retaliatory measures if he believed that his status or position was questioned or compromised.

69.    Currently, Wafra's Human Resources is equally ineffective. Since the time that Ms. Kraut reported Mr. Lively's conduct, she has been aggressively and continuously retaliated against by her peers, replacement supervisors, and Wafra's management.

**E.      After Ms. Kraut reported Mr. Lively's conduct to Wafra, Wafra and its employees and agents repeatedly retaliated against her and completely changed her role.**

70.      In or about April 2018, after years of dealing with Mr. Lively's conduct, Ms. Kraut finally worked up the courage to report Mr. Lively's sexual harassment and discrimination to Wafra.  Upon information and belief, Wafra terminated Mr. Lively from his position as Senior Managing Director as a result.  However, Wafra placed Mr. Lively's close personal friend, Yvonne Compitello ("Ms. Compitello"), as his replacement.  Wafra's termination of Mr. Lively did not adequately correct the impact of Mr. Lively's sexual harassment because of subsequent and ongoing retaliation by Wafra and its employees.

71.      After Mr. Lively's departure, Wafra, and its employees and agents, began to retaliate against Ms. Kraut, changing her responsibilities, and removing her from significant projects and investments that she had been working on.

72.      Beginning in or about May 2018, Ms. Compitello and Mr. Ryan removed Ms. Kraut's most significant job responsibilities, which centered on working on hotel fund investments and marketing.  Ms. Kraut had been solely staffed on the hotel fund-related matters at Wafra since the hotel fund's inception.

73.      This has had a significant impact on Ms. Kraut's earning ability and career.  There are several additional accounts that are close to committing equity to the various investment opportunities, separate accounts or funds for the Real Estate Department, which Ms. Kraut has played a significant role in developing over many years, and which would entitle Ms. Kraut to significant additional compensation.  Her removal from these projects substantially marginalized her role at Wafra, which will make it difficult for her to be promoted.

74.      As a result of Ms. Compitello's and Mr. Ryan's actions, Ms. Kraut was repeatedly excluded from meetings on the projects that she had a substantial role in developing.

75.     On or about May 7, 2018, Ms. Kraut emailed Ms. Compitello, copying Human Resources, in an attempt to ascertain why she was being removed from a particular investment that she worked on from its inception.  Ms. Compitello responded and stated that she asked Mr. Ryan to take the lead because Ms. Kraut was out of the office.  In fact, Ms. Kraut was out of the office for approximately a week because Mr. Lively's employment had just been terminated, and Ms. Kraut was stressed out from years of Mr. Lively's sexual harassment.

76.     Prior to the termination of Mr. Lively's employment, Ms. Kraut's role with respect to this particular investment was to manage all aspects of the deal for Wafra.  However, after termination of Mr. Lively's employment, Ms. Kraut was isolated from this and other deals.

77.     For instance, in or about July 2018, Wafra personnel repeatedly left Ms. Kraut off correspondence, communications and meetings about the acquisition opportunity, offer, and deal details.  This placed Ms. Kraut in a precarious position as she did not have the required information to be fully briefed and prepared on the deal, which set her up to fail.

78.     On or about July 18, 2018, Ms. Kraut was directed to review the deal's budget and provide comments within a few days prior to closing; however, she was being forced to make these without much of the information necessary to complete such a task successfully since she was excluded from it after Mr. Lively's termination.

79.     By setting her up to fail in this way, Wafra is highly likely to deny Ms. Kraut appropriate credit, which includes her share of the hotel's acquisition and asset management fees for her work on this investment.

80.     As a direct and proximate result of the actions described above, Ms. Kraut suffered and continues to suffer actual damages, including monetary damages, damages to her reputation

and career through misdirected retaliation, psychological and emotional pain, mental anguish, fear

for her physical safety, and humiliation, in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

### (Sexual Harassment, Hostile Work Environment, in Violation of Title VII – Against Defendant Wafra)

81.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

82.     By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to sexual

harassment and a hostile work environment.

83.     The harassment was pervasive and affected the terms, conditions, or privileges of

Ms. Kraut's employment.

84.     Defendant Wafra knew, or should have known, about the sexual harassment and

failed to take corrective action for many years.  Additionally, for many years Defendant Wafra had

no meaningful reporting process to which Ms. Kraut could avail herself.

85.     As a direct and proximate result of Defendant Wafra's unlawful conduct in

violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic

harm for which she is entitled to an award of damages.

86.     As a direct and proximate result of Defendant Wafra's unlawful conduct in

violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which

she is entitled to an award of compensatory damages.

87.     Defendant Wafra's unlawful and discriminatory actions were intentional, done with

malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights

under Title VII, for which Plaintiff is entitled to an award of punitive damages.

88.     Plaintiff is also entitled to an award of attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**(Sexual Harassment, *Quid-Pro-Quo*, in Violation of Title VII – Against Wafra)**

89.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

90.     By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to *quid-pro-quo* sexual harassment.   For many years, Ms. Kraut was the subject of unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

91.     The submission to the unwelcome advance was an express or implied condition for receiving job benefits.  Ms. Kraut's refusal to submit to her supervisor's sexual demands resulted in tangible job detriments (including loss of advancement and promotions, denied requests for transfers, and the loss of significant compensation).  Defendant Mr. Lively would also refuse to speak to Ms. Kraut for days after she would reject his advances, which hurt her ability to succeed at her job.

92.     Defendant Wafra was responsible for Defendant Mr. Lively's conduct.

93.     As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

94.     As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

95.     Defendant Wafra's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

96.     Plaintiff is also entitled to an award of attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### (Discrimination in Violation of Title VII – Against Wafra)

97.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

98.     By reason of the foregoing, Defendant Wafra discriminated against Ms. Kraut within the meaning of Title VII, on the basis of sex.

99.     Defendant Wafra knew, or should have known, about the discrimination and failed to take corrective action for many years.  Additionally, for many years Defendant Wafra had no meaningful reporting process to which Ms. Kraut could avail herself.

100.    As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

101.    As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

102.    Defendant Wafra's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

103.    Plaintiff is also entitled to an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Retaliation in Violation of Title VII – Against Wafra)

104.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

105.    Plaintiff engaged in protected activity when she reported to Defendant Wafra that she had been the victim of discrimination in violation of Title VII in the manners described above.

106.    Defendant Wafra retaliated against Plaintiff, in violation of Title VII by, *inter alia*, marginalizing her role within the company, changing her responsibilities, and removing her from significant projects and investments she had been working on for many years.

107.    As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of Defendant Wafra's retaliatory conduct, Plaintiff has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally.

108.    As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

109.    Defendant Wafra's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

110.    Plaintiff is also entitled to an award of attorneys' fees and costs.

## **FIFTH CAUSE OF ACTION**

**(Sexual Harassment, Hostile Work Environment, in Violation of the NYSHRL)**
**(Against All Defendants)**

111.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112.     By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to sexual harassment and a hostile work environment within the meaning of NYSHRL, N.Y. Exec. L. § 290 et seq.

113.     The harassment was pervasive and affected the terms, conditions, or privileges of Ms. Kraut's employment.

114.     Wafra knew, or should have known, about the sexual harassment and failed to take corrective action for many years.   Additionally, for many years Defendant Wafra had no meaningful reporting process to which Ms. Kraut could avail herself.

115.     As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

116.     As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

## **SIXTH CAUSE OF ACTION**

**(Sexual Harassment, *Quid-Pro-Quo*, in Violation of the NYSHRL)**
**(Against All Defendants)**

117.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

118. By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to *quid-pro-quo* sexual harassment within the meaning of the NYSHRL, N.Y. Exec. L. § 290 et seq. For many years, Ms. Kraut was the subject of unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

119. The submission to the unwelcome advance was an express or implied condition for receiving job benefits. Ms. Kraut's refusal to submit to her supervisor's sexual demands resulted in tangible job detriments (including loss of advancement and promotions, denied requests for transfers, and the loss of significant compensation). Defendant Mr. Lively would also refuse to speak to Ms. Kraut for days after she would reject his advances, which hurt her ability to succeed at her job.

120. Defendant Wafra was responsible for Defendant Mr. Lively's conduct.

121. As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

122. As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

### SEVENTH CAUSE OF ACTION

### (Discrimination in Violation of the NYSHRL – Against All Defendants)

123. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

124. By reason of the foregoing, Defendant Wafra discriminated against Ms. Kraut within the meaning of the NYSHRL, N.Y. Exec. L. § 290 et seq., on the basis of sex.

125.     Defendant Wafra knew, or should have known, about the discrimination and failed to take corrective action for many years.  Additionally, for many years Defendant Wafra had no meaningful reporting process to which Ms. Kraut could avail herself.

126.     As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

127.     As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

## EIGHTH CAUSE OF ACTION

**(Retaliation in Violation of the NYSHRL – Against All Defendants)**

128.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

129.     Plaintiff engaged in protected activity when she reported to Defendant Wafra that she had been the victim of discrimination in violation of the NYSHRL in the manners described above.

130.     Defendant Wafra retaliated against Plaintiff, in violation of the NYSHRL by, *inter alia*, marginalizing her role within the company, changing her responsibilities, and removing her from significant projects and investments she had been working on for many years.

131.     As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of

Defendant Wafra's retaliatory conduct, Plaintiff has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally.

132.    As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

## NINTH CAUSE OF ACTION

**(Sexual Harassment, Hostile Work Environment, in Violation of the NYCHRL)**
**(Against All Defendants)**

133.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

134.    By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to sexual harassment and a hostile work environment within the meaning of NYCHRL, N.Y. City Admin. Code § 8-107 et seq.

135.    The harassment was pervasive and affected the terms, conditions, or privileges of Ms. Kraut's employment.

136.    Defendant Wafra knew, or should have known, about the sexual harassment and failed to take corrective action for many years.  Additionally, for many years Defendant Wafra had no meaningful reporting process to which Defendant Ms. Kraut could avail herself.

137.    As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

138.    As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

139.    Defendant Wafra's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION

**(Sexual Harassment, *Quid-Pro-Quo*, in Violation of the NYCHRL)**
**(Against All Defendants)**

140.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

141.    By reason of the foregoing, Defendant Wafra has subjected Ms. Kraut to *quid-pro-quo* sexual harassment within the meaning of the NYCHRL, N.Y. City Admin. Code § 8-107 et seq.  For many years, Ms. Kraut was the subject of unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

142.    The submission to the unwelcome advance was an express or implied condition for receiving job benefits.  Ms. Kraut's refusal to submit to her supervisor's sexual demands resulted in tangible job detriments (including loss of advancement and promotions, denied requests for transfers, and the loss of significant compensation).  Defendant Mr. Lively would also refuse to speak to Ms. Kraut for days after she would reject his advances, which hurt her ability to succeed at her job.

143.    Defendant Wafra was responsible for Defendant Mr. Lively's conduct.

144.    As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

145.    As a direct and proximate result of Defendant Wafra's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

146.    Defendant Wafra's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION

### (Discrimination in Violation of the NYCHRL – Against All Defendants)

147.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

148.    By reason of the foregoing, Defendant Wafra discriminated against Ms. Kraut within the meaning of the NYCHRL, N.Y. City Admin. Code § 8-107 et seq, on the basis of sex.

149.    Defendant Wafra knew, or should have known, about the discrimination and failed to take corrective action for many years.  Additionally, for many years Defendant Wafra had no meaningful reporting process to which Ms. Kraut could avail herself.

150.    As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

151.    As a direct and proximate result of Defendant Wafra's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

152.    Defendant Wafra's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## TWELFTH CAUSE OF ACTION

### (Retaliation in Violation of the NYSHRL – Against All Defendants)

153.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

154.    Plaintiff engaged in protected activity when she reported to Defendant Wafra that she had been the victim of discrimination in violation of the NYCHRL, N.Y. City Admin. Code § 8-107 et seq., in the manners described above.

155.    Defendant Wafra retaliated against Plaintiff, in violation of the NYCHRL by, *inter alia*, marginalizing her role within the company, changing her responsibilities, and removing her from significant projects and investments she had been working on for many years.

156.    As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of Defendant Wafra's retaliatory conduct, Plaintiff has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally.

157.    As a direct and proximate result of Defendant Wafra's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

158.    Defendant Wafra's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### THIRTEENTH CAUSE OF ACTION

### (Unjust Enrichment – Against All Defendants)

159.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

160.    The Defendants benefited by the work Ms. Kraut performed.  She was entitled to origination fees, promotions, advancement, and transfer opportunities based on this work, but was improperly denied.

161.    The benefits to the Defendants included, but was not limited to, the work Ms. Kraut performed originating new funds, such as the German Fund, and other funds.  Defendant Wafra benefited by profiting from these funds.  Defendant Mr. Lively benefited because he took the credit and earned compensation that should have gone to Ms. Kraut.

162.    Wafra further benefited by not compensating Ms. Kraut for this work. Additionally, Defendant Wafra benefited by denying Ms. Kraut promotions, advancement opportunities, and transfers, thereby saving money that would have been used as additional compensation to Ms. Kraut.

163.    Equity and good conscience require restitution to Ms. Kraut.

### FOURTEENTH CAUSE OF ACTION

### (Quantum Meruit – Against All Defendants)

164.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

165.     Ms. Kraut performed services in good faith.

166.     Ms. Kraut was led to believe that Defendant Wafra and Defendant Mr. Lively would promote her and advance her career if she performed these services in good faith.

167.     Ms. Kraut also performed services in good faith by originating new funds, such as the German Fund, and other funds.

168.     Defendant Wafra and Defendant Mr. Lively accepted these services.  Defendant Wafra profited from the funds, and Defendant Mr. Lively, as Ms. Kraut's supervisor, received additional compensation on the basis of the funds' establishment.

169.     It is customary at Defendant Wafra and the industry for the individual responsible for securing and originating new deals to receive at least 1% in fees.  Ms. Kraut performed these services expecting to be compensated for them.

170.     Accordingly, Defendant Wafra and Defendant Mr. Lively should compensate Ms. Kraut for the reasonable value of her services, which is at least 1% of the value of the German Fund plus any additional funds she has helped originate.

## ATTORNEY'S FEES

171.     Plaintiff is entitled to attorney's fees under the applicable federal and state statutes and provisions of the Administrative Code of the City of New York.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment and relief as follows:

A.     Declaring that Defendants' acts complained of herein violated Plaintiff's rights under Title VII, NYSHLR, and the NYCHRL;

B.     Awarding Plaintiff a money judgment for damages, including but not limited to lost compensation deprived by Defendants, lost pay, future pay, lost benefits, and other economic

damages; and damages for the shame, humiliation, embarrassment, physical and emotional pain,

mental anguish, and humiliation suffered by Plaintiff, in an amount to be determined at trial;

C.      Awarding Plaintiff punitive damages, as applicable, for Defendants' willful and

wanton disregard of her rights;

D.      Awarding Plaintiff her reasonable costs and attorney's fees incurred in connection

with this action; and

E.      Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury of all claims triable to a jury in this action.

Dated: New York, New York
        November 29, 2018

                                        WALDEN MACHT & HARAN LLP


                                By:   _/s/ Milton L. Williams_____
                                        Milton L. Williams
                                        Adam P. Cohen
                                        Avni P. Patel
                                        One Battery Park Plaza
                                        New York, NY 10004
                                        (212) 335-2030
                                        *Attorneys for Plaintiff*